IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| ESSEX INSURANCE COMPANY, )<br>    Plaintiff, )<br> )<br>v. )<br> )<br>Y&J CONSTRUCTION, INC., *et al.*, )<br>    Defendants. )<br> ) | Case No. 1:15-cv-1597 |

## MEMORANDUM OPINION

This insurance coverage dispute arises from property damage caused by a fire that occurred during a construction project at Building 207 at Fort Belvoir, Virginia (the "Fort Belvoir project").[1] The damage stemmed from roofing activities by a subcontractor, defendant Y&J Construction, Inc. ("Y&J"), that involved the use of torches in the installation of the roof. The general contractor's insurer, defendant Pennsylvania National Mutual Insurance Company ("Penn"), paid for the damage and subsequently filed a subrogation action against Y&J to recover the amount paid. *See Pa. Nat'l Mut. Cas. Ins. Co. v. Y&J Constr., Inc.*, No. 15-cv-1283 (E.D. Va. Oct. 2, 2015) (Complaint) (the "Subrogation Action").[2] Specifically, Penn, in the Subrogation Action, has alleged (i) that Y&J acted negligently in causing the Fort Belvoir fire on August 13, 2012; (ii) that Y&J breached its subcontracting agreement with the general contractor on the Fort Belvoir project, Autumn Contracting, Inc. ("Autumn Contracting"); and (iii) that

---

[1] Fort Belvoir is a United States Army base.

[2] Y&J is currently in default in the instant action, and plaintiff's motion for default judgment has been deferred pending resolution of the bench trial in this case.

1

Y&J must indemnify Penn. *See id.* Y&J's insurer, Essex Insurance Company ("Essex"), filed this declaratory judgment action pursuant to 28 U.S.C. § 2201(a),[3] seeking:

(i) a declaration that Essex has no obligation to defend Y&J in Penn's Subrogation Action against Y&J;

(ii) a declaration that Essex has no obligation to indemnify Y&J for any judgment, settlement, or recovery in the Subrogation Action; and

(iii) a declaration that Essex has no obligation to Penn, including any obligation to indemnify Penn, with respect to any subrogation rights Penn possesses as a result of Penn's payment on behalf of its insured resulting from the Fort Belvoir fire caused by Y&J.

Following full discovery and the disposition of pretrial motions, the parties waived a jury, and a bench trial was held. During the bench trial plaintiff presented three witnesses, and defendant offered two. Importantly, it was undisputed that Y&J's use of torches caused the fire at the Fort Belvoir project on August 13, 2012, and that the insurance policy ("the Policy") that Essex issued to Y&J included a roofing endorsement that excluded from coverage damages arising from Y&J's use of torches. Given that these essential facts were undisputed, during the trial the parties focused on the following key issues: (i) whether Y&J was given notice of the roofing endorsement in the Policy; and (ii) whether Y&J is entitled to reformation of the Policy's roofing endorsement to include coverage of Y&J's torch work. The following Findings of Fact and Conclusions of Law are issued pursuant to Rule 52, Fed. R. Civ. P.

## I. FINDINGS OF FACT

1. Essex was an insurance company organized under the laws of Delaware, with its principal place of business in Glen Allen, Virginia.[4]

---

[3] 28 U.S.C. § 2201(a) does not provide a basis for subject matter jurisdiction. *See, e.g., Skelly Oil Co. v. Philips Petrol. Co.*, 339 U.S. 667, 671 (1950). But subject matter jurisdiction nonetheless exists here as the parties are of diverse citizenship and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332(a).

[4] As of June 30, 2016, Evanston Insurance Company is the successor by merger to Essex.

2. Essex contracted with an insurance broker, All Risks, Inc. ("All Risks"), to underwrite, issue, and deliver insurance policies on Essex's behalf. All Risks underwrote the Policy at issue in this case.

3. Y&J was a corporation organized under the laws of Maryland, with its principal place of business in Fulton, Maryland. Y&J's president was Youngjae Jeon ("Jeon"), and Y&J's general manager was Ms. Jeon's husband, Duok Yun ("Yun").[5]

4. Ms. Jeon, Y&J's president, is a registered nurse with a master's degree in Hospital Administration who reads, writes, and speaks English.

5. Penn is a corporation organized under the laws of Pennsylvania with its principal place of business in Harrisburg, Pennsylvania.

6. At all relevant times, Y&J and Penn transacted or did some business in Virginia.

7. Defendant Penn insured Autumn Contracting, the general contractor on the Fort Belvoir project.

8. On November 7, 2011, Autumn Contracting and Y&J executed a Master Subcontracting Agreement, which agreement obligated Y&J to perform roofing work on the Fort Belvoir project and to obtain insurance coverage for that work.

9. Subsequently, Y&J engaged Insurance Plus, an experienced, licensed insurance agency based in Maryland, to provide Y&J assistance in procuring commercial general liability insurance for Y&J's roofing work on the Fort Belvoir project.

10. Insurance Plus is licensed to sell, solicit, and negotiate insurance contracts in Virginia, and has offices in both Maryland and Virginia.

11. Y&J selected Insurance Plus after looking through the Korean business phone book, noting that Insurance Plus was a Korean insurance agency, and learning that one of Insurance Plus's employees, Jong Yang ("Yang"), spoke Korean.

12. Jeon and Yun, on behalf of Y&J, visited Yang at an Insurance Plus office in Virginia on one occasion; during the course of that visit, Jeon and Yun informed Yang that Y&J was opening a roofing business and needed general liability and worker's compensation insurance coverage.

13. Y&J advised Insurance Plus that Y&J's workers had used torches on past roofing projects. Although Y&J misrepresented in its insurance application how much of its work

---

[5] Y&J is now defunct, as it was dissolved following the Fort Belvoir fire.

dealt with new roofing, as opposed to repair work, Mr. Yun stated that Y&J sought coverage for work involving the use of asphalt, metal roofs, welding, and torches.

14. Mr. Yang at Insurance Plus assisted Jeon and Yun in filling out the paperwork to obtain insurance coverage from a surplus lines insurance carrier for Y&J's roofing work at the Fort Belvoir project.[6]

15. Essex's broker, All Risks, drafted the Policy in Maryland on behalf of Essex.

16. The Policy was issued to Y&J as a commercial general liability insurance policy for the period running from November 14, 2011 to November 14, 2012, in the amount of $1,000,000 for any occurrence and $2,000,000 in general aggregate limit, subject to the terms and exclusions of the Policy.

17. The Policy was sent to Insurance Plus from Maryland, and delivered to Y&J in Maryland.

18. Insurance Plus also sent Y&J a certificate of liability insurance that, on its face, stated that the certificate was not the Policy and conferred no rights on the certificate holder. D. Ex. 6.

19. The Policy requires Essex to provide coverage for amounts that Y&J becomes legally obligated to pay as damages due to "bodily injury" or "property damage" to which the Policy applies. *See* Policy (P. Ex. 2) § I-1.

20. Specifically, "property damage" under the Policy means, *inter alia*, "[p]hysical injury to tangible property, including all resulting loss of use of that property." *See id.* at CG 00 01 12 07.

21. The Policy includes a provision permitting a "person or organization" to sue Essex on the "Coverage Part [so long as] all of its terms have been complied with." *Id.* at CG 00 01 12 07 § 3.

22. The Policy further permits "[a] person or organization [to] sue [the insurer] to recover on an agreed settlement or on a final judgment against an insured," so long as the damages are "payable under the terms of [the Policy] and [not] in excess of the applicable limit of insurance." *Id.*

23. Pursuant to the Policy, Essex has no duty to defend the insured against any suit seeking damages for bodily injury or property damage to which the insurance coverage does not apply.

---

[6] Surplus lines insurance exists for risks that do not typically fit the insurance market. As a surplus lines insurer, Essex does not directly solicit business from entities seeking coverage.

24. In this respect, the Policy contains a roofing endorsement that excludes from coverage any bodily injury, property damage, personal injury, advertising injury, or any injury, loss, or damage arising out of "[a]ny operations involving any hot tar, wand, open flame, torch or heat applications, or membrane roofing." *Id.* M/E-191 (4/99), § 3.

25. The Policy also excludes from coverage "claims arising out of breach of contract, whether written or oral, express or implied, implied-in-law, or implied-in-fact…." *Id.* MEGL 0001 05 10, § 1.

26. Essex would not have issued the insurance policy without a roofing endorsement, and the Policy's premium would have been significantly higher had Essex intended to cover the torch work that caused the fire at the Fort Belvoir project.

27. On November 9, 2011, before Y&J purchased the Policy, an underwriter employed by All Risks sent Insurance Plus an email advising that the Policy would include the roofing endorsement. That November 9, 2011 email also attached the roofing endorsement. *See* P. Ex. 33 ("I have attached a copy of the roofing endt ME-191 (4/99).").

28. That same day, November 9, 2011, All Risks also sent Insurance Plus two insurance quotations for the Policy.

29. The first quotation warned that the coverage Essex was offering could differ from the coverage Y&J had requested. Specifically, the quotation stated, "We are pleased to submit our proposal . . . . Quote is based on the following limits, coverage, etc. Please read quote carefully as coverages being offered may be more limited than coverages requested." P. Ex. 40.

30. This document quoted the total price of the insurance premium, plus fees, as $4,679.

31. The second quotation included a similar warning regarding endorsements, stating that the "quotation may differ from the terms requested in [Y&J's] submission. Please review our quotation carefully." P. Ex. 41.

32. This second quotation further warned, in bold letters and enlarged font size, "Please review form ME191 for the types of roofing exposures that we exclude." *Id.*

33. That same document specifically noted in capitalized letters that form ME191 was a "ROOFING ENDORSEMENT." *Id.*; *see* Findings of Fact ¶ 24 (quoting form ME191).

34. On November 11, 2011, Y&J's President, Ms. Jeon, wrote a check from a Maryland bank account for $4,679—the exact amount identified one of the quotations, P. Ex. 40—made payable to All Risks, which check Essex ultimately received.

35. Penn now claims that Y&J was unaware of the roofing endorsement before the August 13, 2012 fire, contending that although the quotations and Policy were sent to Insurance

Plus, Y&J never saw those documents and the Policy was never delivered to Y&J. These claims are not supported by the evidence.[7]

36. To begin with, Insurance Plus's regular practice over the past 25 years has been to forward quotations and insurance policies to clients; moreover, Insurance Plus's customary practice is to inform clients of coverage exclusions and to communicate the nature of such exclusionary language. Thus, although Mr. Yang at Insurance Plus does not specifically recall forwarding the Policy or specifically discussing the roofing endorsement with Y&J, it is more likely true than not that Mr. Yang forwarded the Policy to, and discussed the Policy's exclusions with, Y&J.

37. Indeed, Mr. Yang testified that he gave Ms. Jeon a copy of a quotation (P. Ex. 41), which identified and disclosed the roofing endorsement.

38. Consistent with Mr. Yang's testimony, Y&J's president, Ms. Jeon, admitted that while she was procuring insurance coverage—i.e., before the Policy was issued or delivered, and well before the August 2012 fire—she received both quotations (P. Exs. 40 and 41). *See* Findings of Fact ¶¶ 28-37.

39. Specifically, on re-direct examination, Ms. Jeon testified that she received the document identified as P. Ex. 40 "[w]hile I [was] getting the insurance" at "around the same time" that she received a copy of the quotation identified as P. Ex. 41. Tr., Day 2, 31:19-24; 32:9-11.

40. Ms. Jeon further testified that the reason she knew to write the November 11, 2011 check for precisely $4,679—the exact amount identified in the first November 9, 2011 quotation, P. Ex. 40—is because Jeon had received and reviewed the quotation identified as P. Ex. 40.[8]

---

[7] Penn's argument is puzzling in this respect, because if the Policy was never delivered to Y&J, then there is no insurance contract between Essex and Y&J. *See Res. Bankshares Corp. v. St. Paul Mercury Ins. Co.*, 407 F.3d 631, 635 (4th Cir. 2005) (under Virginia law, "a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured."); *Encompass Home & Auto Ins. Co. v. Harris*, 93 F. Supp. 3d 424, 432 (D. Md. 2015) (under Maryland law, once the premium has been paid, "the last act necessary for formation of the contract is the delivery of the [insurance] policy" (citing cases)). Of course, if no contract of insurance ever existed for lack of delivery, then Essex owes no obligation to Y&J, and thus Essex would be entitled to the declaratory relief sought in the instant action.

[8] *See* Tr., Day 2, 13:22-25–14:1-3 ("THE COURT: Is your receipt of [P. Ex. 40] before you wrote the check, is that how you knew how much the check should be for and to whom the check should be written?" THE WITNESS: Yes. I am so sorry I was so stupid. I cannot remember, but probably I wrote the check amount, I mean, as I was asked."). The witness, after several substantial pauses, subsequently stated that she wrote the check based on what Mr. Yang of

41. In addition, just four months after the August 2012 fire, Y&J admitted, in a pleading pertaining to a related case in the Eastern District of Virginia, that the Policy had been delivered to Y&J in Maryland. *See Essex Ins. Co. v. Y&J Constr., Inc.*, No. 1:12-cv-1102 (E.D. Va. Dec. 17, 2012) (Answer); P. Exs. 58-59.

42. On August 13, 2012, Y&J, despite having received notice that the Policy would include a roofing endorsement, nonetheless used torches in connection with the installation of membrane roofing on the Fort Belvoir project, which resulted in a fire causing substantial damage.

43. Penn paid $3,749,315.63 on behalf of its insured, Autumn Contracting, in connection with the Fort Belvoir fire.

44. On October 2, 2015, Penn initiated the Subrogation Action against Y&J for $3,749,315.63, alleging three counts.

45. Penn claims to be subrogated to Autumn Contracting's rights against Y&J pursuant to the Master Subcontracting Agreement between Y&J and Autumn Contracting.

46. Specifically, Count I of Penn's Complaint against Y&J in the Subrogation Action alleges that Y&J negligently caused damage to the Fort Belvoir building. Count II of Penn's Complaint against Y&J in the Subrogation Action alleges breach of contract. Count III in the Subrogation Action alleges a claim for indemnification.

47. After the filing of Penn's Subrogation Action, Essex submitted to Y&J a reservation of rights letter, reserving the right to deny coverage on the basis of the Policy's roofing endorsement and/or breach of contract exclusion. Shortly thereafter, Essex initiated the instant action.

## II. CONCLUSIONS OF LAW

1. Jurisdiction exists over the matter and the parties, as there is diversity subject matter jurisdiction pursuant to 28 U.S.C. § 1332, and the parties are subject to personal jurisdiction in the Eastern District of Virginia. Venue is also proper in this district.

2. Declaratory relief is appropriate, as an actual controversy exists regarding the existence and extent of any obligations Essex may owe Y&J and Penn in the underlying

---

Insurance Plus had told her, but she could not remember if he had advised her in person, by phone, or via email. *Id.* 14:8-23. Ms. Jeon later testified, however, that Mr. Yang had provided her a copy of that quotation (P. Ex. 40), probably via email. *Id.* 31:19-25—32:1-11. Based on the witness's initial answer, subsequent pauses, demeanor, and selective memory, it is more likely true than not that Ms. Jeon's first answer—that she knew to write a check worth $4,679 because she had received P. Ex. 40—is the accurate and truthful answer.

      Subrogation Action. Because there is no adequate legal remedy, other than declaratory relief, by which this controversy may be resolved, it is appropriate to award declaratory relief pursuant to 28 U.S.C. § 2201 and Rule 57, Fed. R. Civ. P.

3. Insurance Plus was the agent of Essex, not Y&J, by virtue of Va. Code § 38.2-1801A.[9]

4. Maryland law governs the interpretation of the Policy, as that is the place where the Policy was written, mailed, and delivered. This result follows from the well-settled rule that a federal court sitting in diversity applies the conflict of law rules of the state in which the court sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). And under Virginia's conflict of law rules, "[q]uestions concerning the validity, effect, and interpretation of a contract are resolved according to the law of the state where the

---

[9] This provision states that "[a] licensed agent shall be held to be the agent of the insurer that issued the insurance sold, solicited, or negotiated by such agent in any controversy between the insured or his beneficiary and the insurer." Va. Code. § 38.2-1801A. In this regard, § 38.2-1800 defines a "licensed agent" as "an individual or business entity licensed in the Commonwealth to sell, solicit, or negotiate contracts of insurance or annuity of the classes authorized within the scope of such license." *Id.* § 38.2-1800. Insurance Plus unquestionably meets the definition of a "licensed agent," as Insurance Plus has a license to sell, solicit, and negotiate insurance contracts in Virginia and, in fact, negotiated and solicited the Policy from an office in Virginia. Thus, Insurance Plus must, pursuant to Virginia statute, be deemed the agent of Essex.

      Seeking to avoid this result, Essex argues that § 38.2-1801A does not apply because (i) the Policy was written and delivered in Maryland, and (ii) section 38.2-1801A lies outside the scope of the Virginia Insurance Code's provisions regarding surplus lines insurance. Neither argument is persuasive. First, regardless where the Policy was underwritten or delivered, Insurance Plus is undoubtedly a licensed agent pursuant to § 38.2-1800, and indeed Insurance Plus prepared Y&J's insurance application from Insurance Plus's Virginia office; moreover, the statute does not require that an insurance contract be written or delivered in Virginia for § 38.2-1801A to apply to an agent's conduct in Virginia. *See, e.g.*, *Travelers Indem. Co. of Am. v. Miller Bldg. Corp.*, No. 3:03-CV-441, 2003 WL 23512080, at *3 (E.D. Va. Dec. 24, 2003) ("[Section] 38.2–1801 is not a choice of law provision, but rather an agency law provision."), *rev'd on other grounds*, 142 F. App'x 147 (4th Cir. 2005). Second, § 38.2-4815 makes clear that "[e]xcept as otherwise provided . . . the provisions relating to the licensing and control of surplus lines brokers shall have no effect on or in any way alter any of the other provisions of this title," and there is no indication that § 38.2-1801A has been circumscribed by the provisions relating to surplus lines brokers. *See* Va. Code. § 38.2-4815.

      To be sure, this result appears to create an anomaly, as there were in fact *two* middle-men—Insurance Plus and All Risks—who negotiated the Policy on behalf of Y&J and Essex, respectively. Thus it seems odd to hold Insurance Plus as an agent of the insurer when (i) Insurance Plus was contacted by the insured and proceeded to negotiate on behalf of the insured, and (ii) the insurer had its own agent, All Risks, to negotiate on the insurer's behalf. In any event, although the parties have spilled substantial ink on the question of agency, whether Insurance Plus is the agent of Essex or Y&J is immaterial to the ultimate disposition of the instant case.

contract was made." *Seabulk Offshore v. Am. Home Assur. Co.*, 377 F.3d 408, 419 (4th Cir. 2004) (applying Virginia law). In this respect, "[u]nder Virginia law, a contract is made when the last act to complete it is performed, and in the context of an insurance policy, the last act is the delivery of the policy to the insured." *Id.*[10] Importantly, "[w]hen an insurer mails a contract of insurance to its agent for unconditional delivery to the insured, delivery is effected when deposited in the mail." *Rose v. Travelers Indem. Co.*, 167 S.E.2d 339, 342 (Va. 1969). Thus, because Va. Code § 38.2-1801A renders Insurance Plus the agent of Essex, and because the Policy was mailed from Maryland, delivery became effective in Maryland, and thus Maryland law governs the validity, effect, and interpretation of the Policy.[11]

5. Under Maryland law, "when deciding the issue of coverage under an insurance policy, the primary principle of construction is to apply the terms of the insurance contract itself." *Bausch & Lomb, Inc. v. Utica Mut. Ins. Co.*, 625 A.2d 1021, 1031 (Md. 1993). In general, the words of the policy are given "their usual, ordinary, and accepted meaning," i.e., the "meaning a reasonably prudent layperson would attach to the term." *Id.* If the language of the insurance contract is "clear and unambiguous," then the presumption is "that the parties meant what they actually said, regardless of what they may have intended." *Aetna Ins. Co. v. Aaron*, 685 A.2d 858, 864 (Md. Ct. Spec. App. 1996). Notably, "Maryland does not follow the rule, adopted in many jurisdictions, that an insurance policy is to be construed most strongly against the insurer." *Bausch & Lomb, Inc.*, 625 A.2d at 1031.

---

[10] Some Virginia cases have indicated that the place where a contract was *written* is also instructive with respect to the source of governing law. *See Buchanan v. Doe*, 431 S.E.2d 289, 291 (Va. 1993) ("[T]he law of the place where an insurance contract is written and delivered controls issues as to its coverage."). Of course, because the Policy was written in Maryland, the Supreme Court of Virginia's decision in *Buchanan* further supports the conclusion that Maryland law governs the validity, effect, and interpretation of the Policy.

[11] Even assuming, *arguendo*, that Insurance Plus was the agent of Y&J, Maryland law would still control the interpretation of the contract, as the trial record unambiguously discloses that the Policy was sent to Insurance Plus in Maryland, and thus, under the principle of constructive delivery, the Policy still would have been delivered in Maryland. *See, e.g.*, *Rose*, 167 S.E.2d at 342 ("When an insurer mails a contract of insurance . . . for unconditional delivery to the insured, delivery is effected when deposited in the mail."); *see also* 16 Williston on Contracts §§ 49:62-65 (4th ed. 2015) (delivery occurs when the insurer manifests an intention to give the policy legal effect by taking some visible step to put the policy beyond the insurer's control); 1A Couch on Insurance § 14:12 (3d ed. June 2016 Update) (similar). And to the extent Penn argues that there was no delivery whatsoever, then Essex would be entitled to the declaratory relief it seeks on the ground that Y&J had no insurance contract to begin with. *See supra* note 7.

9

6. At issue, therefore, in this case is whether Essex has, pursuant to the Policy, (i) a duty to pay Y&J or Penn in the event of a judgment against Y&J in the Subrogation Action, or (ii) a duty to defend Y&J in the Subrogation Action.

7. As in other jurisdictions, under Maryland law "[t]he 'duty to defend is broader than and different from the duty to pay,'" as the duty to defend operates "if the claim asserted against the insured is covered, or even potentially covered, by the applicable insurance policy." *Aetna Ins. Co.*, 685 A.2d at 863 (quoting *Luppino v. Vigilant Ins. Co.*, 677 A.2d 617, 622 (Md. Ct. Spec. App. 1996)).

8. Count I of Penn's Complaint against Y&J in the Subrogation Action alleges that Y&J negligently caused damage to the Fort Belvoir building. In this respect, Penn seeks to recover for "property damage" that "ar[ose] out of . . . operations involving . . . torch or heat application," which is not covered by the Policy. *See* Policy M/E-191 (4/99). Put simply, because the fire was caused by Y&J's use of torches during the installation of rubber membrane, Essex has no duty to defend or indemnify Y&J with respect to Count I of the Subrogation Action.

9. This is so because Count I of Penn's subrogation lawsuit seeks to recover for damages resulting from physical injury to tangible property, namely Building 207 at Fort Belvoir.[12] Importantly, the term "property damage" has a special meaning that is set out in Section V of the Policy. *See* Policy, CG 00 01 12 07, at 1.[13] Indeed, "property damage" under the Policy means, *inter alia*, "[p]hysical injury to tangible property, including all resulting loss of use of that property." *Id.* at 15. Thus, the damage identified in Count I of the Subrogation Action falls squarely within the ambit of the Policy's roofing endorsement.[14]

---

[12] *See Pa. Nat'l Mut. Cas. Ins. Co. v. Y&J Constr., Inc.*, No. 15-cv-1283 (E.D. Va. Oct. 2, 2015) (Complaint), ¶ 15 ("The fire spread throughout the roof causing substantial damages to the Fort Belvoir building"); ¶ 16 ("As a result of the fire . . . the Department of the Army demanded . . . repairs be performed by Autumn Contracting, Inc."); ¶ 23 ("As a direct and proximate result of [Y&J's] negligent acts and omission the Fort Belvoir building caught fire resulting in damages[.]").

[13] It is well-settled that where "there is an indication that the parties intended to use words in the policy in a technical sense," that technical sense applies. *Bausch & Lomb, Inc.*, 625 A.2d at 1031.

[14] Although neither party has cited a Maryland case with materially similar facts, the interpretation and conclusion reached here accords with the interpretation and conclusion of the Louisiana Court of Appeals, which applied legal principles nearly identical to those under Maryland law to construe the exact same roofing endorsement language in issue here as excluding coverage for property damage arising from a residential fire caused in the course of roofing work using a torch. *See generally Encompass Ins. Co. v. Gammon Roofing, LLC*, 996 So.2d 16 (La. Ct. App. 2008). Although *Encompass* is not binding in the instant action, the

10. Next, Penn's claims against Y&J in Counts II (breach of contract) and III (indemnification) of the Subrogation Action are both premised on breaches of the written Master Subcontract Agreement between Y&J and Autumn Contracting. *See Pa. Nat'l Mut. Cas. Ins. Co. v. Y&J Constr., Inc.*, No. 15-cv-1283 (E.D. Va. Oct. 2, 2015) (Complaint), ¶¶ 26-35. Essex has no duty to defend or pay based on these Counts, either, because the Policy includes a broad exclusion for claims arising out of breach of contract.

11. Specifically, the Policy's combination general endorsement provides in relevant part: "This insurance does not apply to claims arising out of breach of contract, whether written or oral, express or implied, implied-in-law, or implied-in-fact contract."[15] *See* Policy, MEGL 0001 05 10, § 1.

12. Accordingly, Counts II and III of Penn's Subrogation Action against Y&J fall squarely within the plain language of the Policy's breach of contract exclusion, and thus Essex has no obligation to defend Y&J or to pay Penn in the event that Penn secures a judgment against Y&J on Count II, Count III, or with respect to the underlying fire at the Fort Belvoir project.

13. Moreover, Penn is not entitled to reformation of the Policy's roofing endorsement.

14. To begin with, Maryland law applies to the question of reformation, as the equitable remedy of reformation of contract relates to the nature and interpretation of the Policy.[16]

15. Under Maryland law, reformation is an equitable remedy "warranted only when one of two circumstances exist: 'either there must be mutual mistake, or there must be fraud, duress, or inequitable conduct.'"[17] The party seeking reformation must adduce "clear,

---

reasoning there is persuasive and firmly supports the conclusion reached with respect to the Policy's coverage for the Subrogation Action against Y&J for negligence.

[15] The other breach of contract exclusion is in the main body of the Policy and contains two exceptions. *See* Policy, CG 00 01 12 07, at 2. Because the combination general endorsement more straightforwardly resolves this case, the exclusion in the main body of the Policy need not be considered.

[16] *See Roberts v. USAA Cas. Ins. Co.*, 173 F.3d 425 (4th Cir. 1999) (Table Decision) (applying law governing contract to reformation claim); *Charter Oak Fire Co., v. Am. Capital, Ltd.*, No. DKC 09-0100, 2016 WL 827380 (D. Md. Mar. 3, 2016) (same). Even if Virginia law applied to the question of reformation, the analysis under Virginia law is essentially the same as the analysis under Maryland law. *See infra* note 17.

[17] *Jaguar Land Rover N.A., LLC v. Manhattan Imported Cars, Inc.*, 738 F. Supp. 2d 640, 650 (D. Md. 2010) (quoting *Md. Port Admin. v. John W. Brawner Contracting Co.*, 492 A.2d 281, 288

    convincing and satisfying proof of a mutual understanding and bargain that has not been accurately expressed."[18] Importantly, "no party has a right to rescind or modify a contract merely because he or she finds, in the light of changed conditions, that he or she has made a bad deal."[19]

16. As a threshold matter, Penn has standing to seek reformation of the Policy as an intended third-party beneficiary of that contract with a right to sue on the Policy's terms.[20] Indeed, as required by both Virginia and Maryland law, the Policy includes a provision permitting a "person or organization" to sue Essex on the Policy's "Coverage Part [so long as] all of its terms have been complied with." Policy at CG 00 01 12 07 § 3. Relatedly, the Policy provides that "[a] person or organization may sue [the insurer] to recover on an agreed settlement or on a final judgment against an insured," so long as the damages are "payable under the terms of [the Policy] and [not] in excess of the applicable limit of insurance." *Id.*[21] Thus, Penn may seek reformation.

17. Although Penn has standing to seek reformation, Penn's reformation claim is properly limited to reformation based solely on mutual mistake; in other words, Penn is not entitled to reformation on the ground of fraud, duress, or inequitable conduct, because

---

(Md. 1985)). Virginia law applies an essentially identical standard. *See Ward v. Ward*, 387 S.E.2d 460, 462 (Va. 1990) ("The equitable remedy of reformation . . . provides relief against a mistake of fact in a written instrument in only two instances. The first is where the mistake is mutual . . . . The second is where there is mistake on the part of only one party, that is, the mistake is unilateral, but it is accompanied by misrepresentation and fraud perpetrated by the other." (quotation marks and alterations omitted)); *Bankers Fire Ins. Co. v. Henderson*, 83 S.E.2d 424, 429 (Va. 1954) ("It is well settled that equity has jurisdiction to reform written instruments (1) [w]here there has been an innocent omission or insertion of a material stipulation, contrary to the intention of both parties, and under a mutual mistake; and (2) where there has been a mistake of one party accompanied by fraud or other inequitable conduct of the remaining parties." (quotation marks omitted)).

[18] *City of Baltimore v. De Luca-Davis Constr. Co.*, 124 A.2d 557, 560 (Md. 1956).

[19] *Janusz v. Gilliam*, 947 A.2d 560, 567 (Md. 2008) (alterations omitted).

[20] *See, e.g.*, *Int'l Serv. Ins. Co. v. Gonzales*, 194 Cal. App. 3d 110, 118-19 (Cal. Ct. App. 1987) ("Reformation of a liability insurance policy may be sought only by the contracting parties, their assignees or the intended beneficiaries of the insurance contract.").

[21] *Cf.* Md. Code. Ins. § 19-102(b)(2) (requiring each liability insurance policy issued in Maryland to provide that "if an injured person . . . is unable, after execution on a final judgment entered in an action against an insured, to recover the full amount of the final judgment, the person may bring an action against the insured's insurer in accordance with the terms of the policy for the lesser of the amount of the judgment recovered in the action against the insured or the amount of the policy"); Va. Code § 38.2-2200(2) (similar).

Penn did not properly plead those grounds in its Answer or in any counterclaim. Rather, the Answer pled *mutual mistake of fact*—not reformation based on fraud, duress, or inequitable conduct—as an affirmative defense. *See LaSalle Bank, N.A. v. Reeves*, 173 Md. App. 392, 412 (Md. Ct. Spec. App. 2007) ("A proper case for the reformation of instruments must be made by the pleadings, and, in order to make out a good cause of action, the pleading should allege in clear . . . language . . . every element necessary to entitle the complainant to equitable relief."); Pleading Causes of Action in Maryland § 2.23 at 126. Indeed, the "right to reformation must be properly raised by the pleadings. As in other actions, all facts necessary to make out a case must be pleaded . . . ." 66 Am. Jur. 2d Reformation of Instruments § 100. Because Penn did not plead or seek reformation based on fraud, duress, or inequitable conduct in its Answer or in a counterclaim, Penn is not entitled to reformation based on those grounds.[22]

18. But even assuming, *arguendo*, that Penn properly pled both theories of reformation, Penn's reformation claim would nonetheless fail.

19. To begin with, Penn's reformation claim fails insofar as Penn contends that a mutual mistake of fact existed. This is so because the trial record clearly reflects that Essex knew of the roofing endorsement. Thus, there was no mutual mistake. *See, e.g.*, *Flester v. Ohio Cas. Ins. Co.*, 307 A.2d 663, 669-70 (Md. 1973) (denying reformation where the evidence did not "conclusively establish[]" a mutual mistake).

20. To the extent Penn asserts that reformation is appropriate based on a unilateral mistake, this argument also fails, as Penn has not shown by clear and convincing evidence that there was "fraud, duress, or inequitable conduct." *Jaguar*, 738 F. Supp. 2d at 650.[23]

21. Y&J did not act under duress, as there was no evidence to suggest any duress whatsoever.

22. Nor did Penn meet its burden to demonstrate fraud or inequitable conduct, because Y&J was put on notice of the roofing endorsement in the Policy before Y&J decided to

---

[22] In fact, Penn did not specifically plead "reformation" at all. Yet, because Penn pled a mutual mistake of fact, it is appropriate to consider whether Penn is entitled to reformation based on a mutual mistake of fact.

[23] Penn contends that Insurance Plus "defrauded" Y&J because, according to Penn, Insurance Plus falsely claimed to have submitted Y&J's insurance application to three standard insurance carriers before seeking to procure insurance from a surplus lines insurer. D. Br. (Doc. 115) at 27. This point is irrelevant, as there is no evidence in the record that these alleged misrepresentations were material or that Y&J relied on them. Indeed, these alleged misrepresentations have no bearing on Y&J's awareness of a roofing endorsement in the Policy. *Cf. Prospect Dev. Co. v. Bershader*, 515 S.E.2d 291, 297 (Va. 1999) (actual and constructive fraud require clear and convincing evidence of a misrepresentation of *material* fact and detrimental reliance.).

purchase the Policy.[24] *See* Findings of Fact ¶¶ 28-38. Indeed, Essex's disclosures foreclose Penn's reformation claim.

23. In this regard, the evidence reveals that it is more likely true than not that Insurance Plus forwarded two policy quotations to Y&J before Y&J purchased the Policy. Importantly, Penn's own witness—Ms. Jeon herself—admitted that before Y&J purchased the Policy, she had been informed of and received these quotations, which stated in pertinent part:

   a. "Please read quote carefully as coverages being offered may be more limited than coverages requested," P. Ex. 40;

   b. "Our quotation may differ from the terms requested in the submission. Please review our quotation carefully," P. Ex. 41; and

   c. "**Please review form ME191 for the types of roofing exposures that we exclude**." *Id.* (bolded emphasis in original).[25]

24. Given Essex's (and Insurance Plus's) repeated disclosures and the warnings regarding the roofing endorsement, Penn cannot establish by clear and convincing evidence that the equitable remedy of reformation is warranted.

25. Moreover, Penn falls far short of meeting its burden to show fraud or inequitable conduct in light of Y&J's admission in a previous lawsuit that the Policy had been delivered to Y&J in Maryland. *See* Findings of Fact ¶ 41.

26. In sum, given (i) that it is more likely true than not that Insurance Plus, consistent with its regular practice over the last 25 years, forwarded relevant documents and discussed exclusions from coverage with Y&J before Y&J purchased coverage, (ii) that Ms. Jeon admitted to having received, before Y&J purchased the Policy, insurance quotations warning of the roofing endorsement, and (iii) that Y&J admitted in a previous lawsuit that the Policy was delivered in Maryland, this evidence persuasively establishes that there was no fraud or inequitable conduct. That Ms. Jeon neglected to heed numerous clear, enlarged, and bolded statements regarding the roofing endorsement is not

---

[24] *See, e.g.*, *Bershader*, 515 S.E.2d at 297 (elements of actual or constructive fraud require *false* misrepresentation of material fact); *Bankers Fire Ins. Co. v. Henderson*, 83 S.E.2d 424, 429 (Va. 1954) ("Inequitable conduct, as applied to cases on contracts calling for reformation consists in doing acts, or omitting things, or the making of representations, tending naturally to deceive as to the true interpretation of the contract, which the court finds to be unconscionable." (quotation marks and alterations omitted)); *Mgmt. Enters., Inc. v. Thorncroft Co., Inc.*, 416 S.E.2d 229, 231 (Va. 1992) (an inequitable and unconscionable bargain is one "that no man in his senses and not under a delusion would make, on the one hand, and as no fair man would accept, on the other. The inequality must be so gross as to shock the conscience." (quotation marks omitted)).

[25] That same document discloses that form ME191 involves roofing endorsements. P. Ex. 41.

inequitable or fraudulent conduct on the part of Essex or its agents warranting reformation of the Policy or the roofing endorsement.[26]

27. Thus, Essex is entitled to a declaratory judgment stating the following:

   a. Essex has no obligation to defend Y&J in Penn's Subrogation Action against Y&J;

   b. Essex has no obligation to indemnify Y&J for any judgment, settlement, or recovery in the Subrogation Action; and

   c. Essex has no obligation to Penn, including any obligation to indemnify Penn, with respect to any subrogation rights Penn possesses as a result of Penn's payment on behalf of its insured resulting from the Fort Belvoir fire caused by Y&J.

---

[26] Seeking to avoid this result, Penn argues that it was inequitable for Essex to include a roofing endorsement in the first instance, because Y&J had disclosed in its insurance application an intention to use of torches on the Fort Belvoir project. But, the quotations that Y&J's president admitted to having received before purchasing the Policy specifically stated that the Policy could differ from the terms requested in Y&J's submission; indeed, the quotations directed Y&J to read the quotations carefully. P. Exs. 40, 41. Put simply, Penn's argument misses a fundamental point: insurance contracts operate like "contracts generally," and the parties are free to reach an agreement *not* to cover certain activities. *See Bausch & Lomb, Inc.*, 625 A.2d at 1031 (applying ordinary contract principles to insurance contracts); *Mitchell v. AARP Life Ins. Program*, 779 A.2d 1061, 1069-70 (Md. Ct. Spec. App. 2001) (an insurance application is a mere offer). Thus, there was no inequitable conduct by Essex or its agents, as the evidence established that Y&J accepted an offer without reading the documents that Essex and its agents had disclosed to Ms. Jeon.

Alternatively, Penn contends that it was fraudulent or inequitable for Insurance Plus to send Y&J a certificate of insurance that did not disclose the roofing endorsement. This argument also misses the mark; a certificate of insurance is not—and does not create—an insurance contract, nor must a certificate contain all the terms of an insurance policy. *See, e.g.*, *James G. Davis Constr. Corp. v. Erie Ins. Exchange*, 126 A.3d 753, 760 (Md. Ct. Spec. App. 2015) (holding that a certificate of liability insurance is not part of the liability policy and not binding on the insurer where, as here, the certificate clearly states that it is not the insurance policy). Indeed, to adopt Penn's logic in the instant case would lead to the absurd result that the certificate of insurance operated to displace the Policy, a result foreclosed by Maryland and Virginia law.

15

## III.

In sum, Essex is entitled to the declaratory relief it seeks. An appropriate Order will issue in accordance with these Findings of Fact and Conclusions of Law.

Alexandria, Virginia
December 30, 2016

/s/ _____
T. S. Ellis, III
United States District Judge